IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-00530-M

| | |
|---|---|
| **Jennifer Johnson,**<br><br>                Plaintiff,<br><br>v.<br><br>**Martin O'Malley,** Commissioner of<br>Social Security,<br><br>                Defendant. | **Memorandum & Recommendation** |

Plaintiff Jennifer Johnson challenges an Administrative Law Judge's decision to deny her application for social security income. Johnson claims that the ALJ made two errors in reaching that determination. First, the ALJ's decision conflicts with Fourth Circuit case law about how to consider prior disability decisions. And second, the ALJ erred on determining how Johnson uses a hand-held assistive device. Both Johnson and Defendant Martin O'Malley, Commissioner of Social Security, seek a decision in their favor. D.E. 18, 19.

After reviewing the parties' arguments, the undersigned has determined that the ALJ erred in his determination. The ALJ found that Johnson had greater abilities than those reflected in a prior disability determination, but he failed to justify his decision finding lesser limitations. And contrary to the ALJ's decision, the evidence established that Johnson needs a cane for both standing and walking. So the undersigned recommends that the court grant Johnson relief, deny O'Malley relief, and remand this matter to the Commissioner for further consideration.[1]

---

[1] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b). D.E. 20.

# I. Background

## A. Factual

Johnson has suffered from Charcot-Marie-Tooth (CMT) disease all her life, with recent progression of the condition. Tr. at 25. In 2015, electrodiagnostic testing showed evidence of a uniform demyelinating sensorimotor neuropathy with conduction velocities. Tr. at 26. Johnson received Botox injections for her cervical dystonia with hand tremors. *Id.* In August 2019, Johnson had arthroscopic surgery on her left hip. *Id.* Providers performed a labral repair, femoral osteochondroplasty, and complete capsular closure. *Id.*

Two years later, Johnson saw Dr. Jeffrey Cooney at the Duke Movement Disorders Center for worsening balance and vertigo issues. *Id.* After sitting for a while, she experienced "a spinning room" for one to two minutes when she stood up. *Id.* Pain in her toes and cramps in her calves caused trouble with sleep. *Id.* Johnson reported that Botox had helped but her tremors returned after a few months. *Id.*

An examination found severely decreased vibration and joint position sense in her toes, decreased joint position sense in her ankles, and vertiginous sensations with no nystagmus. *Id.* Dr. Cooney remarked that Johnson was experiencing considerably more trouble with joint and neuropathic pain. *Id.* While Gabapentin had helped, she could not tolerate higher doses. *Id.*

At a return visit, Johnson told Dr. Rabia Ghazi that Botox injections had been effective for about two months, although they had previously helped her symptoms for three months. *Id.* She reported continued pain in multiple joints, accompanied by a recent onset of left leg pain. *Id.* Dr. Ghazi remarked that she had some vestibular neuropathy findings. *Id.*

2

On examination, Johnson displayed a slight nystagmus, a mild "no-no" tremor, and severely decreased vibration and joint position sense in her toes. Tr. at 26–27. Dr. Ghazi noted that Gabapentin helped her symptoms, and her vertigo improved after an Epley maneuver. Tr. at 27.

Later that month, Dr. Yohei Harada at Duke's Muscular Dystrophy Clinic saw Johnson for her left hip pain, rated as eight out of ten in intensity. *Id.* Dr. Harada noted bilateral pes cavus with high arches and hammertoes, reduced extremity bulk, and slightly diminished strength in some areas. *Id.* Johnson had no reflexes in her extremities and no sensation in several areas, including her lower legs. *Id.* And Johnson could not tell the movement of her toes. *Id.*

In February 2022, Dr. Cooney observed that the effects of Botox wore off within two months. *Id.* Johnson reported pain around her neck and tightness in the area of her right trapezius. *Id.* Although other providers felt her symptoms were stable, Johnson had increased numbness in her feet with severe, intermittent pain. *Id.* And she reported intermittent, vertigo-like symptoms. *Id.*

Johnson generally used a cane to walk and needed to be more careful moving about. *Id.* She again displayed a slight nystagmus on the right, a mild "no-no" head tremor, and severely decreased vibration and joint position sense in her toes. *Id.*

Three months later, Johnson reported more pulling in the left side of her neck and head shaking when Botox wore off. *Id.* She also experienced an increase in tripping and falling as well as curling toes, clenched hands, hand and leg cramps, and muscle spasms that disrupted her sleep. Tr. at 27–28. An examination yielded findings much like those identified on past exams. Tr. at 28.

Johnson's May 2022 Function Report noted that she used a shower chair to bathe and sometimes received help from her husband with personal care. *Id.* She was shaky when feeding

3

herself. *Id.* Her husband cooked, although Johnson could prepare frozen dinners or sandwiches. *Id.* She did not drive long distances and had her husband or mother accompany her places. *Id.*

At a consultative psychological examination three months later, Johnson had trouble walking and used a walker. *Id.* Dr. Daniel Delgado performed a consultative physical examination later that month. *Id.* Johnson's husband drove her to the appointment, and she walked into the examination with a cane. *Id.* She reported that she could not perform basic household chores, relying on her husband to do them. *Id.* Johnson stated that she did not drive or shop. *Id.*

Johnson used a shower chair when bathing and a cane to walk, so she had one hand available when ambulating. *Id.* Although she used a cane, she tended to lose her balance when standing. *Id.* Johnson reported pain and reduced motion in her hip since her surgery. *Id.* An examination showed a constant "no" neck tremor, diminished lower left extremity strength, and no sensation in her legs. *Id.* Even with a cane, she had an unsteady toe walk and could not perform a heel or tandem walk because of pain and imbalance. *Id.* And Johnson displayed an unsteady gait and station with a cane. *Id.* Dr. Delgado noted some reduced range of motion in her back and lower left extremity. *Id.* But a Romberg test[2] was normal. *Id.*

Dr. Delgado determined that Johnson could frequently stand and walk and could lift and carry up to ten pounds. Tr. at 31. He concluded that she needed a cane for both standing and walking. *Id.*

---

[2] This is a test used to detect balance problems related to proprioception, the body's ability to sense movements and position. It can determine whether one's dorsal column pathway of their brain and spinal cord is not working properly. The test involves standing with your feet together and your arms at your side or crossed in front of you. Part of the test is with your eyes open, and the second part is with your eyes closed. Your healthcare provider observes you during the test and notes any signs of imbalance, such as swaying. *See* Cleveland Clinic Health Library, Diagnostics & Testing, Romberg Test (available at https://my.clevelandclinic.org/health/diagnostics/22901-romberg-test) (last visited August 26, 2024).

The next month, Dr. Cooney again observed that Botox provided about two months of benefit. Tr. at 29. Johnson reported worsening headaches and fatigue. *Id.* And she walked with a cane. *Id.* An examination found a slight nystagmus, mild "no-no" tremor, and severely decreased vibration and joint position sense in her toes. *Id.* Dr. Cooney attributed her fatigue to many factors including her medications and health conditions. *Id.* Later that month, treatment records reflect that Johnson had a slow gait and walked with a cane. *Id.*

Imaging tests of the left hip in December 2022 showed no acute fracture, a low-grade chondroid lesion, preserved joint spaces, mild subchondral sclerosis/cystic change of the superior acetabulum, with normal soft tissue. *Id.* Dr. Lisa Hobson-Webb at the Duke MDA Clinic noted Johnson's continued left hip pain and muscle aches. *Id.* Although she had tried many medications, drowsiness had been an issue for Johnson. *Id.* An examination found normal tone but reduced bulk in her hands and legs, slightly reduced strength, several areas without sensation, and absent reflexes in her arms and legs. *Id.* Because of pain, Dr. Hobson-Webb could not assess Johnson's grip or ability to walk 10 meters. Tr. at 30. Treatment records noted some decline in Johnson's upper extremity function. *Id.*

State agency consultants found that Johnson had no severe mental impairment. Tr. at 31. Despite some anxiety, she had generally normal mental status exam findings and could drive, prepare simple meals, and follow instructions. *Id.*

State agency physicians determined that Johnson could stand and walk for two hours and agreed that Johnson could perform a reduced range of sedentary work. *Id.* At the initial level, Dr. Meghana Karande noted that the evidence documented no changes in Johnson's condition since the 2021 ALJ decision. Tr. at 123.

In a Third-Party Function Report, Johnson's mother, Judy Fleischer, noted that she took Johnson shopping and to medical appointments. Tr. at 33. Fleischer pointed out that Johnson had pain when walking and only drove to places near her home. *Id.* She remarked that Johnson woke up with pain and had undemanding daily activities like reading, watching television, and preparing frozen meals a few times a week. *Id.*

Johnson testified that she has tremors in her head and hands. Tr. at 25. She receives Botox injections, which would help her symptoms for about one month. *Id.* Johnson also experiences hand numbness, so she no longer wears clothes with buttons. *Id.*

Johnson testified that she has foot pain and cannot feel the bottoms of her feet. *Id.* Neuropathic pain caused a pins and needles sensation in the balls of her foot. *Id.* Her provider prescribed Johnson a cane, which she carries in her left hand. *Id.* She uses a cane at all times for standing and walking. *Id.*

Johnson stated that her balance is bad, and she sometimes fall going up stairs. *Id.* She trips over nothing and has at least two falls a week. *Id.* Johnson experiences tightness in her arms and calves with a lot of Charlie horse cramps. *Id.* And Johnson has increased muscle atrophy. *Id.*

Johnson stated that she is always tired. *Id.* She does not drive much. *Id.* Johnson uses a shower seat because she cannot stand in the shower. *Id.* And she relies on her husband to help her with some things. *Id.*

Johnson estimated that she could stand for 10 to 15 minutes with her cane, but not at all without it. *Id.* She can sit for 5 to 15 minutes before she experiences hip pain. *Id.* And she can lift about 10 pounds, but not regularly. *Id.*

### B. Procedural

In December 2021, Johnson applied for supplemental security income alleging a disability that began seven months earlier. After the Social Security Administration denied her claim at the initial level and upon reconsideration, Johnson appeared for a hearing by videoconference before an ALJ to determine whether she was entitled to benefits. The ALJ determined Johnson had no right to benefits because she was not disabled. Tr. at 19–35.

The ALJ found that Johnson lived with severe impairments. Tr. at 21–22. These included Charcot-Marie-Tooth disease (CMT), cervical dystonia/dystonia tremors and neuropathic pain, obesity, and left hip femoral osteoarthropathy. Tr. at 21. The ALJ also found that Johnson's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 23.

Next, the ALJ determined that Johnson has the residual functional capacity (RFC) to perform sedentary work with other limitations. Tr. at 24. She can occasionally use her bilateral upper extremities to engage in overhead activities to reach, lift, push, and pull. *Id.* Johnson can frequently use her dominant right upper extremity to handle, grasp, finger, and feel. *Id.* She can use her non-dominant lower left extremity to operate foot and leg controls on an occasional basis. *Id.* And Johnson must avoid climbing stairs, ladders, ropes, or scaffolds. *Id.*

Johnson cannot work around dangerous, moving, mechanical parts or unprotected heights. *Id.* She cannot stand or walk on narrow, slippery surfaces or uneven terrain. *Id.* She needs a cane in her non-dominant left hand to assist with ambulation. *Id.* And Johnson is limited to short, simple, routine, repetitive tasks performed in two-hour increments. *Id.*

Then the ALJ concluded that Johnson could not perform her past relevant work as a front desk clerk. Tr. at 33. But considering her age, education, work experience, and RFC, the ALJ found that other jobs existed in significant numbers in the national economy that Johnson could

perform. Tr. at 34. The jobs included lens inserter, order clerks, and reel assembler. *Id.* These findings led the ALJ to conclude that Johnson was not disabled. Tr. at 35.

After unsuccessfully seeking review by the Appeals Council, Johnson commenced this action in September 2023. D.E. 1. Both parties seek a decision in their favor. D.E. 18, 19.

## II.    Analysis

Johnson claims that the ALJ failed to properly examine her need for an assistive device. The RFC allows for an assistive device to walk but not for standing. Although an earlier disability decision found that limitation, the ALJ did not explain how Johnson's condition improved when determining her new claim. And the evidence shows that Johnson needed to use a cane for both standing and walking. These errors require the court to remand the matter for additional consideration.

### A.    Standard for Review of the Commissioner's Final Decision

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B.    Standard for Evaluating Disability

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id.*

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id.*

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is unwarranted, the ALJ must then assess the claimant's residual functional capacity ("RFC"). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if so, they are considered disabled. *Id.*

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C.    Prior Disability Determination

Johnson argues that the ALJ erred in considering a 2021 disability decision that contained greater limitations in her residual functional capacity (RFC) than the 2023 finding. O'Malley contends that the ALJ's decision explains why her condition required a cane to walk but not stand. The undersigned finds that further explanation of the earlier disability determination, and why the evidence supported lesser limitations in the later decision, is required.

Social Security's Acquiescence Ruling (AR) AR 00–1(4) directs that an ALJ adjudicating a subsequent disability claim to consider and weigh findings on a prior claim. AR 00–1(4), 2000 WL 43774, at *4 (Jan. 12, 2000).

> [W]here a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period.

*Id.* The Ruling identifies factors relevant to determine the weight of the earlier finding. *Id.* They include:

(1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

*Id*.

Although an ALJ does not have to explicitly discuss each factor or state the weight given to a previous finding to comply with AR 00–1(4), it must be clear that the ALJ considered the previous determination when evaluating the entire record. *Melvin* v. *Astrue*, 602 F. Supp. 2d 694, 702 (E.D.N.C. 2009) ("Although the ALJ did not specifically refer to AR 00–1(4) . . . or explain the precise weight he gave the ALJ's findings . . . the ALJ did consider the prior ALJ's findings as part of reviewing the record."); *see also Cuffee* v. *Berryhill*, 680 F. App'x 156, 159 (4th Cir. 2017); *Dozier* v. *Astrue*, No. 5:08-CV-174, 2009 WL 3063020, at *2, *45 (N.D.W. Va. Sept. 22, 2009) (remanding where ALJ cursorily mentioned previous finding of disability and failed to indicate weight assigned to that decision). Remand is appropriate under AR 00–1(4) where an ALJ neglects to discuss a prior decision at the administrative hearing level, and the prior decision contains findings more favorable to the claimant than the ALJ's subsequent decision. *See Barbee* v. *Colvin*, No. 5:14-CV-424, 2015 WL 5039124, at *8–9 (E.D.N.C. Aug. 7, 2015) (recommending remand where ALJ's RFC finding did not include sit/stand option contained in past decision and ALJ failed to discuss past decision), *adopted*, 2015 WL 5054402 (E.D.N.C. Aug. 26, 2015).

In May 2021, a disability determination found that Johnson could perform sedentary work and required a cane to stand and walk. Tr. at 100. The ALJ also assessed restrictions on manipulations, postural movements, and environmental exposures. *Id.*

Except for asthma, the 2023 decision identified almost identical conditions as severe impairments, with dystonia tremors and neuropathic pain as additional conditions. Tr. at 21. It also determined that Johnson had an RFC to perform sedentary work with similar postural, manipulative, and environmental restrictions. *Id.* Although it allowed her to use a cane for walking, it made no finding about using one to stand, as the 2021 decision determined. *Id.*

The ALJ considered the 2021 disability decision and found it partially persuasive, assigning it some weight. Tr. at 32–33. He remarked that the evidence no longer showed that Johnson's asthma was a severe impairment. Tr. at 32. And the ALJ concluded that the record supported different limitations, like using a cane in her left hand when walking. Tr. at 32–33. In making that finding, the decision references certain evidence about Johnson's hip during the relevant period. *Id.*

Johnson contends that she needs an assistive device for both standing and walking. Yet the ALJ failed to produce substantial evidence that her condition improved. Remand is necessary, she maintains, absent any sound reasons to increase her RFC from the more favorable findings in the 2021 disability determination.

O'Malley argues that the prior decision is not binding on Johnson's later application. He maintains that the ALJ afforded it appropriate consideration and explained why the evidence supported different limitations. O'Malley points out that Johnson had only slightly reduced strength in her lower left extremity and a normal Romberg test. And imaging studies did not support greater restrictions.

The undersigned finds Johnson's argument persuasive and O'Malley's position unpersuasive. The weight of the evidence throughout the longitudinal record establishes Johnson's

12

issues with standing, walking, and balancing. And the reasons the ALJ offered to assign lesser restrictions, departing from the 2021 findings, fail to support his conclusions.

### 1. The Record Establishes Johnson's Significant Limitations with Standing

The AR 00–1(4) factors support Johnson's argument. First, the present disability application was filed in December 2021. Tr. at 19. It maintained a disability onset date of May 26, 2021, one day after the prior ALJ decision. So the passage of time does not support a significant change of condition. *See Grant* v. *Colvin*, No. 4:12-CV-191, 2014 WL 852080, at *7 (E.D. Va. Mar. 4, 2014) (Regulations provide that, for matters that can change with time, the likelihood of change increases with the interval of time).

Second, the conditions that Johnson suffers appear to be ones that are chronic or progressive in nature. Although there may be issues of stability, it is reasonable to expect that improvement over time may be uncommon. *See, e.g.*, *Albright* v. *Comm'r, Soc. Sec. Admin.*, 174 F.3d 473, 476 (4th Cir. 1999) ("The mere passage of time often has a deleterious effect on a claimant's physical or mental condition."). So while the RFC examines one's functional abilities, and not merely diagnoses, it is reasonable to infer that many conditions Johnson has would not improve with time. *Pickett* v. *Berryhill*, No. 7:17-CV-00238-FL, 2019 WL 847745, at *5 (E.D.N.C. Jan. 28, 2019), *adopted*, 2019 WL 845415 (E.D.N.C. Feb. 21, 2019).

Third, evidence during the relevant period for her current disability application does little, if anything, to detract the prior findings about her use of a cane. To the contrary, the record supports the argument she advances—a long-term condition with symptom progression causing increasing functional limitations.

Treatment records show that Johnson has long suffered from CMT, and the condition has progressed. Examinations consistently noted severely decreased vibration and joint position sense

in her toes, as well as decreased joint position sense in her ankles. She experienced joint and neuropathic pain. Johnson also displayed a slight nystagmus, a mild "no-no" head tremor, bilateral pes cavus with high arches and hammertoes, reduced extremity bulk, and slightly diminished strength in some areas. Providers noted absent reflexes and several areas without sensation, including her lower legs. She reported vertigo symptoms and increased numbness in her feet. She could not detect the movement of her toes.

Although medication helped some of Johnson's symptoms, she could not take higher doses. Johnson also had some benefit from Botox injections, but the positive effects of those had diminished over time.

The record consistently reflects Johnson's use of an assistive device. And despite having a cane, her gait and station remained unsteady.

Dr. Delgado observed that Johnson had a slight reduction in strength in her lower left extremity. He also noted her reduced range of motion in her hips and ankles and diminished sensation, including her lower legs which had no sensation. Johnson had an unsteady toe walk and she could not perform either the heel walk or tandem walk because of pain and imbalance. Even with a cane, she displayed an unstable gait and station. Dr. Delgado determined that Johnson required a cane at all times to stand and walk for support, stability, and balance. Importantly, one of the state agency physician noted that the evidence documented no changes in Johnson's condition since the 2021 ALJ decision.

Johnson testified that her symptoms limited her daily activities. She could only prepare simple meals, would only drive short distances, and relied on other family members to perform household chores and assist her with personal care.

Johnson could not stand when bathing and had to use a shower chair. She could stand for 10 to 15 minutes with her cane, but not at all without it. Even when she used a cane, she may lose her balance. Johnson experienced increased tripping and she had about two falls a week. And Johnson's mother identified similar limitations.

Absent from the record is evidence that Johnson's condition improved. While some findings may not appear significant, such as a slight reduction in lower extremity strength, when considered together with other evidence, like absent sensation and reflexes, tremors, and an unsteady gait and station, the record bolsters Johnson's claims. So there is abundant support for Johnson's argument, and the prior disability determination, that she requires a cane to both walk and stand.

### 2. The ALJ Reasons Do Not Support His Conclusion

The ALJ cited an x-ray and two consultative examination findings to conclude that Johnson required no assistive device when standing. Yet these isolated records neither fully illustrate her overall condition nor support his determination that she can stand without a cane.

First, the December 2022 imaging does nothing to undermine a conclusion that Johnson had significant problems standing and walking. This evidence cited by the ALJ, and relied on by O'Malley, is one x-ray report showing two views of Johnson's left hip. Tr. at 453. It assessed the alignment, as well as the bones, joint spaces, and soft tissue within her left hip structure. *Id.*

Notably, it made no assessment of the lower parts of her bilateral lower extremities. This report did not evaluate her ankles, which had reduced strength. It did not examine her toes, which she could not feel. And the study made no assessment of her lower legs, which had impaired sensation. Even if the x-ray examined these parts, it is uncertain whether the many signs and symptoms common to CMT, and which Johnson reported, like pain, cramping, spasms, loss of

sensation, reduced motion, and imbalance are capable of any meaningful assessment through x-ray.

So the imaging study does not discredit other evidence establishing that Johnson has difficulty standing and balancing and must rely on an assistive device.

Second, the Romberg test results similarly fail to overcome the significant evidence of Johnson's limitations.[3] This singular finding by the consultative examiner assessed Johnson's balance. The record offers no details of how the consultative examiner conducted the test or of Johnson's performance. Tr. at 440.

Generally, the Romberg test assesses one's ability to remain upright for one minute, first with eyes open and then with eyes closed. *See* Cleveland Clinic Health Library, Diagnostics & Testing, Romberg Test (available at https://my.clevelandclinic.org/health/diagnostics/22901-romberg-test (last visited May 23, 2024). A Romberg test is positive if the subject loses balance by showing increased swaying, foot movement, or falling. *Id.*

The Romberg test evaluates if balance issues relate to the dorsal column. *Id.* So it may not detect balance issues attributed to other causes. Thus, if a Romberg test cannot evaluate all causes of imbalance, a reasonable conclusion may be drawn that a normal Romberg test does not necessarily establish normal balance. So Johnson's normal Romberg test does not contradict other evidence showing her imbalance.

More importantly, Dr. Delgado, the consultative examiner who performed the Romberg test, observed that Johnson had an unsteady toe walk and could not perform either the heel walk or tandem walk because of pain *and imbalance*. Tr. at 440. He also found decreased lower left

---

[3] One study remarked that a positive Romberg test was present in only 3% of CMT patients it tested. *See* Vinci, P., Perelli, S. and Esposito, C. (2001), *Charcot-Marie-Tooth Disease: Poor Balance & Rehabilitation,* J. of the Peripheral Nervous Sys., 6(1) at 58 (2001).

extremity strength, a loss of sensation in her bilateral lower extremities, and limited range of motion in her hips and ankles. Tr. at 440, 442, 444. Dr. Delgado noted that even when using a cane, Johnson had an unstable gait *and station*. Tr. at 441 (emphasis added). He determined that Johnson required at all times for both walking and standing. *Id.* (emphasis added). And she needed a cane for support, stability, and *balance. Id.* (emphasis added). So the normal results with the Romberg test that Dr. Delgado performed did not support a conclusion that Johnson had no significant issues with balance and could stand without an assistive device, as the ALJ found.

Third, the reference to a minimal reduction in lower extremity strength does little to support the ALJ's determination on this point. Dr. Delgado found that Johnson had 4/5 strength in her lower left extremity. Tr. at 440. Although this one record may not establish that Johnson needs to use a cane for standing and walking, it must be considered along with the overall evidence.

As noted above, the record shows a significant and lifelong condition that has caused a loss of strength, sensation, and functioning, primarily affecting Johnson's lower extremities. Her symptoms limit her ability to stand and walk, even with the use of an assistive device.

So it appears that the ALJ isolated this finding out of context when considering what the longitudinal record illustrates about Johnson's functioning. When considered along with other tests, records, treatment notes, and statements, a slight reduction in lower left extremity strength one time supports, rather than contradicts, the limitations claimed. And it bolsters a conclusion that Johnson requires an assistive device for standing and walking.

In evaluating a prior disability determination, an ALJ must point to substantial evidence of improvement before reconfiguring a less restrictive RFC. *See Albright,* 174 F.3d at 477 (explaining that the Commissioner must show "substantial evidence of improvement in [the claimant's]

17

condition" to depart from prior, more favorable RFC). The ALJ identified no evidence, let alone significant evidence, establishing that Johnson's symptoms improved.

Instead, the evidence the ALJ considered largely tracks the records and findings at issue in the prior decision. Aside from her asthma, nothing in the record for the period at issue undermines the 2021 finding nor shows that Johnson's condition was less limiting. The ALJ cited no evidence that would explain an increase in her functional ability.

Although the ALJ acknowledged the previous decision, he failed to offer sound reasons to depart from more favorable findings without any evidence of significant improvement. *See Barbee*, 2015 WL 5039124, at *8 (remanding where the lack of explanation was material "because the impairments underlying these limitations are chronic and degenerative in nature" and "[t]he ALJ's failure to explain how, or even whether, she determined that plaintiff's conditions had improved since the 2009 decision precludes meaningful review by the court of the ALJ's decision."). So the ALJ's consideration of the 2021 decision does not comply with AR 00–1(4)'s requirements. *See Horton* v. *Berryhill*, No. 2:16-CV-00020, 2017 WL 4445986, at *7 (W.D. Va. Oct. 5, 2017) ("While a step-by-step explanation is not required for an ALJ to comply with AR 00–1(4), an ALJ's written decision must provide an explanation for discrediting or failing to adopt past administrative findings favorable to the claimant."), *adopted*, 2018 WL 890070 (E.D.N.C. Feb. 14, 2018); *Huey* v. *Comm'r of Soc. Sec.*, No. 3:20-CV-00341-RJC, 2022 WL 680217, at *4 (W.D.N.C. Mar. 7, 2022).

Without a reasonable explanation to support his less restrictive RFC determination, there is no "accurate and logical bridge from the evidence to [his apparent] conclusion" that Johnson no longer needed a cane for standing. *Monroe* v. *Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting

*Clifford* v. *Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). And the undersigned cannot find that substantial evidence supports the determination.

Johnson has presented a meritorious issue. So the undersigned recommends that the court grant her relief and remand the matter on this issue.

### D.    Assistive Device

Building on her prior argument, Johnson claims that the evidence showed she needed an assistive device to stand and walk, and she could not carry anything when she ambulated. She contends that the RFC overstates her abilities because it allowed her to use a cane only for walking, not standing. The Commissioner asserts that substantial evidence supports the RFC and Johnson has failed to carry her burden of showing she is more limited than the RFC found. The undersigned finds that the evidence establishes that Johnson needs a cane to both stand and walk. So the court should grant Johnson relief and remand the action on this issue.

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96–8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must also consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker* v. *Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

19

The ALJ must provide "findings and determinations sufficiently articulated to permit meaningful judicial review." *DeLoatche* v. *Heckler*, 715 F.2d 148, 150 (4th Cir. 1983); *see also Wyatt* v. *Bowen*, 887 F.2d 1082, 1989 WL 117940, at *4 (4th Cir. 1989) (per curiam). The ALJ's RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio* v. *Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96–8p). Furthermore, "[t]he record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford* v. *Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Fourth Circuit precedent "makes it clear that it is not [the court's] role to speculate as to how the ALJ applied the law to [her] findings or to hypothesize the ALJ's justifications that would perhaps find support in the record. *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

Social Security Ruling 96–8p explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed in the regulations. "Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96–8p. The Ruling further explains that the residual functional capacity "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

There is no "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis[.]" *Mascio*, 780 F.3d at 636. But "[r]emand may be appropriate . . .

where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki* v. *Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). The function-by-function requirement can be satisfied by reference to a properly conducted analysis by a state agency consultant. *See, e.g.*, *Linares* v. *Colvin*, No. 5:14-CV-00129, 2015 WL 4389533, at *3 (W.D.N.C. July 17, 2015) ("Because the ALJ based his RFC finding, in part, on the function-by-function analysis of the State agency consultant, the ALJ's function-by-function analysis complied with [Soc. Sec. Ruling] 96–8p." (citing *Lemken* v. *Astrue*, No. 5:07-CV-33-RLV-DCK, 2010 WL 5057130, at *8 (W.D.N.C. July 26, 2010))).

"The requirement to use a hand-held assistive device may . . . impact . . . [an] individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00J4. Thus, an ALJ must consider the effect of "medically required" hand-held assistive devices. *Eason* v. *Astrue*, No. 2:07-CV-30-FL, 2008 WL 4108084, at *16 (E.D.N.C. Aug. 29, 2008); SSR 96–9, 1996 WL 374185, at *7 (July 2, 1996).

A hand-held assistive device is "medically required" if "medical documentation establish[es] the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96–9p, 1996 WL 374185, at *7. "The claimant bears the burden of presenting 'medical evidence establishing the need for a cane and describing the circumstances for which it is needed.'" *Gilmer* v. *Berryhill*, No. 3:17-CV-539-FDW, 2018 WL 3518470, at *2 (W.D.N.C. July 20, 2018) (quoting SSR 96–9p). "[A] prescription or the lack of a prescription for an assistive device is not necessarily dispositive of medical necessity." *Fletcher* v.

21

*Colvin*, No. 1:14-CV-380, 2015 WL4506699, at *8 (M.D.N.C. July 23, 2015) (citing *Staples* v. *Astrue*, 329 F. App'x 189, 191–92 (10th Cir. 2009)).

Whether the need for a hand-held assistive device affects functional capacity depends on the particular circumstances of the case. For example, a person who requires a hand-held assistive device in one hand to walk may be able to use the other hand to perform requirements of many occupations. SSR 96–9p. "On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities . . . may be significantly eroded." *Id.*

This matter largely tracks the previous issue. As discussed, the ALJ determined that Johnson could perform a reduced range of sedentary work. And he concluded that she needed a cane to walk. But the RFC did not include a limitation for her to use an assistive device when standing.

Paralleling the consideration of the prior disability finding, the evidence establishes a conclusion that Johnson requires the use of an assistive device for both standing and walking. So the ALJ erred in determining her RFC excluding that limitation.[4]

The records show severely decreased vibration and joint position sense in her toes and ankles, a slight nystagmus, a mild "no-no" head tremor, bilateral pes cavus with high arches and hammertoes, reduced extremity bulk, and slightly diminished strength. Providers noted absent reflexes, no sensation in her lower legs, and reduced range of motion in her lower extremities.

Johnson reported vertigo symptoms, increased foot numbness, and an inability to detect toe movement. She experienced joint and neuropathic pain.

---

[4] This omission also may impact the RFC determination for how Johnson could use her bilateral her upper extremities. Because using a cane to stand would occupy one upper extremity, Johnson would only have her other upper extremity available to exertional and postural movements when she was not seated.

The record consistently reflects Johnson's use of an assistive device. And despite having a cane, her gait and station remained unsteady.

Dr. Delgado determined that Johnson required an assistive device at all times to stand and walk for support, stability, and balance. A state agency physician noted no changes in Johnson's condition since the 2021 ALJ decision.

Johnson's limited activities track her statements of symptoms, with a limited ability to perform household chores and reliance of others for assistance. She stated that she could stand for 10 to 15 minutes with her cane, but not at all without it. Even when she used a cane, she may lose her balance and continues to have falls.

The effect of an omission from the RFC allowing her to use a cane when standing is clear. The Vocational Expert testified that no jobs would be available to Johnson if her RFC included a limitation allowing her to use a cane to stand. Tr. at 87.

As noted above, the evidence confirms Johnson's claims that she required an assistive device more than the RFC allowed. The longitudinal record supports a finding that she was unbalanced and unsteady even when she used a cane. There no evidence contradicting this conclusion. So the undersigned cannot conclude that substantial evidence supports the RFC finding omitting a restriction for Johnson's use of a cane to stand.

Having presented a meritorious claim, the undersigned recommends that the court grant Johnson relief on this issue and remand the matter for further consideration of her use of an assistive device when standing.

**III. Conclusion**

For these reasons, the undersigned recommends that the court grant Johnson's request for relief (D.E. 18), deny O'Malley's request for relief (D.E. 19), and remand this matter to the Commissioner for further consideration.

The Clerk of Court must serve a copy of this Memorandum and Recommendation (M&R) on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: September 9, 2024

_Robert T. Numbers II_
Robert T. Numbers, II
United States Magistrate Judge